## Young v. McCraw's Adm'x et al.

(Decided June 25, 1937.)

(As Modified on Denial of Rehearing Oct. 5, 1937.)

WOODWARD, DAWSON & HOBSON and WILBUR FIELDS for appellant.

HITE H. HUFFAKER, JOHN R. MOREMEN and GORDON, LAURENT, OGDEN & GALPHIN for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Josephine Young brought this action against Owen McCraw for a declaration of rights under an instrument purporting to be a contract of sale. McCraw defended on the ground that the instrument was a mortgage given to secure such sums as he might advance, and that the sums advanced amounted to a total of $10,-337.93. On final hearing the chancellor adjudged the instrument a mortgage, and gave McCraw an equitable lien on the property for the sum of $5,500, inferior only to a $14,000 mortgage in favor of the Home Owners' Loan Corporation. Mrs. Young appeals.

The facts are: Appellant and L. P. Young were married several years ago. On February 26, 1926, they purchased a home site in Anchorage, and some time later erected a dwelling on the property. The greater portion of the cost of the home was paid by Mrs. Young and her mother, and the title placed in Mrs. Young. Mr. McCraw was a devoted friend of the Youngs, and helped them in many ways during the depression. On September 2, 1930, Mrs. Young and her husband entered into a contract with McCraw by which they sold him the

Anchorage property. In addition to the assumption of the $12,000 mortgage on the property, McCraw agreed to pay first parties $1,000 in cash, and to execute a note for $7,000, payable on or before September 10, 1931. As a part of the agreement the Youngs agreed to occupy the premises and pay McCraw a rental of $50 a month until he demanded possession of the premises. They further agreed to execute a deed whenever he requested it. The $1,000 was paid, but the note for $7,000 was not executed. After the execution of the contract, McCraw paid the taxes and insurance on the property, and $70 a month on the mortgage for a period of 42 months. During the same time the Youngs paid $50 a month as rent, which was added to the payments made by McCraw. When the Youngs stopped paying the rent, McCraw discontinued the payments on the mortgage. The Youngs were divorced in the year 1935.

According to Mrs. Young, McCraw was present when she signed the contract, and she understood he was to give $1,000 for an option with the intention of probably buying the property within a year, and if he did not do that the matter was to be dropped. She signed the contract without reading it. She never received the $1,000, nor any other sum. Mr. McCraw's relations with them were very friendly, and he was selected as their child's godfather. Her child was sick at the time, and she was thinking about her so much that she left the business transactions to Mr. Young. At one time she undertook to sell the property because of their inability to make the payments, and found a purchaser. The purchaser had the title examined, and Mrs. Young learned then that the McCraw contract had been filed of record. L. P. Young testified that, immediately after the break in the stock market, their income was so reduced that they could not make the $120 a month payments on the mortgage to the Fidelity & Columbia Trust Company. The place could not be sold at that time. They could not give it away, and they could not afford to live in it. He suggested that they make Charlie McCraw a present of the equity in the place because he could afford to carry it. At that time Charlie offered $1,000 for an option, which he refused. He then had to change his set-up, and it ended with the contract. They could afford to pay $50 a month rent. Charlie mailed him a check for $70.00. He would put the $50 rent with it and pay the Fidelity & Columbia Trust Company $120

a month. Charlie paid the insurance and taxes. He paid $1,000 at the time the contract was signed and $1,000 twice after that. Charlie also advanced 60 shares of New York Central stock and 200 shares of Illinois Central stock, all amounting to $3,400. The second payment of $1,000 was made on September 28, 1931. The third payment was made on May 2, 1932. Both of these payments were made on the contract and all the family got the benefit of them. He never discussed with his wife whether the contract was to be a sale of the property or security for debt. It was their understanding that the contract was a mere formality, and that Charlie McCraw was putting up the money in order to allow them to keep their home. It was a memorandum to protect Charlie for any interest or any equity that might be in the place over the mortgage. No one represented Charlie in the drawing of the contract. Joe Laurent drew the contract for him. Mrs. Young signed the contract at home, and he took it up to Bedford for McCraw to sign. McCraw never expressed any desire to own the property. McCraw expressed the hope that Young would be able to get on his feet and take the property back. In the execution of the contract he represented his wife. His wife left matters of that kind to him. As he remembered it, there was some doubt in their minds to start with as to whether it was an actual sale or not, but he knew that some time later it was not an exact sale and Charlie had merely advanced them the money in order that they would not lose their home. It was hard for him to remember the exact language used at the time the contract was made. The thing that started it was his offering to give Charlie McCraw an equity in the place, at which time Charlie offered $1,000 for an option. That led to the contract by which he tried to work out a plan whereby they could afford to live where they were. His wife was advised of the plan. He told his wife that Mr. McCraw was going to put up some money to help him, and he told her what he was going to do in order to secure the advances. After the loan had become delinquent for several months, he received a letter from the Fidelity & Columbia Trust Company suggesting that it be refinanced by the Home Owners Loan Corporation, which was done. On cross-examination L. P. Young testified as follows: For several years he had been running a laundry business known as "The Community Laundry," and had had considerable financial

difficulty in its operation. Prior to the execution of the contract in September, 1930, he had gotten from McCraw considerable sums of money to help in the operation of the laundry. If it had not been for McCraw's assistance he would have lost the laundry. Aside from other sums mentioned, Mr. McCraw had advanced him considerable money for that purpose, and had helped carry his account with Henning-Chambers & Co. He now owes McCraw on that account approximately $6,-000. The contract was made as security for the money which Charlie McCraw was advancing them to live on. At that time their equity in the place was not worth a nickel. McCraw had offered to give $1,000 for an option to buy the place at $20,000. How the transaction started was his offering to give McCraw the place. On redirect examination Young stated that he declined the $1,000 for an option because he regarded it simply as a gift. Afterward the contract was entered into. Mr. McCraw testified as follows: He had known the Youngs for several years. His relations with them were most cordial. He had some transactions with Mr. Young in 1929. This was for the purpose of helping him finance the laundry. Later on Mr. Young told him that he was going to lose his house and said: "I think I will make you take it as a gift." He said: "Things are not that bad, are they?" Young said: "Yes, they are." He replied: "I will help you to finance your place." It had a mortgage on it for $12,000. Besides three $1,000 checks as he remembered, he was paying $70 a month and they were paying him $50 a month rent. The $120 a month was to pay off the mortgage to the Trust Company. He had not the slightest idea of wanting the house. He had a place in the country and did not want it, but the contract was drawn up to protect him or his wife if anything should happen. Young told him one day he would refinance the loan with the Home Owners Loan Corporation for $14,000, and could keep up the payments. Up to the present time he had put in over $10,000. The checks were all made to L. P. Young, and would show. All the money was there and he had nothing to show for it. McCraw also testified as follows:

"8. Mr. McCraw, I will ask you to state whether or not you had any intention of buying the property of the Youngs at Anchorage when you entered into the contract with them. A. I would have bought it if I had to and that is what my contract

stated and I lived up to it, I would take the property and there has not been a nickel of rent coming from it for over two years that I received.''

On cross-examination McCraw testified as follows:

''18. Mr. McCraw, did you know that Lev Young had made this mortgage to the Home Owners Loan Corporation? A. He talked to me about it and I agreed with him it was the thing to do, he said he could raise that to $14,000.00 and could take care of the payments of $90.00 and let me out from paying any more money all the time and I told him I thought it was the thing to do.

''19. All of that took place before it was refinanced in the Home Owners Loan Corporation? A. Why, certainly, he could not have done anything else.

''20. Now, when you signed this paper which was recorded in the County Clerk's Office you understood that gave you a right to purchase the property? A. Absolutely and forced me to purchase it if they wanted me to do it.

''21. They gave you an option to purchase that property at such time as you should see fit? A. And they could make me take it if they wanted to.

''22. You understood that was a binding option? A. I told you that four times they could force me to take it any time they wanted to according to the contract.

''23. That is buy the property according to the terms of the contract? [Objected to by counsel for defendants and objection overruled.]

''24. So you understand that it gave you an option to purchase and further gave them the privilege of requiring you to purchase the property for the amount set out in the contract? A. I answered that question, absolutely.

''25. You answered 'yes,' didn't you? A. I said 'yes.' * * *

''48. And you had no desire to purchase that house? A. No, but I will take it if it is pushed on me, but I certainly do not feel kindly to people who will slip in and try to ignore my rights on the

property and try to sell it without my knowledge and consent.

"49. It has never been your desire or intention to buy that house. A. I have told you two or three times I will take it if they want me to and I will meet that obligation, I would rather have the house sold."

On February 17, 1936, Mrs. Young's attorneys sent to McCraw a letter demanding that either he immediately quitclaim all right, title, and interest in the property, or comply with the terms of the contract to purchase the property for $20,000. Thereupon McCraw had served on Mrs. Young a writing demanding that she execute to him a fee-simple title to the property, and that she surrender possession thereof on or before March 22, 1936. Mrs. Young answered and said she would be glad to comply with his demand to execute the deed and vacate the premises, if McCraw would comply with the terms of his contract.

The rule is that a conveyance intended only as a security for a debt previously or contemporaneously created, or to be created, will be adjudged a mortgage, regardless of the form of the transaction. Wade v. McGinnis, 247 Ky. 261, 56 S. W. (2d) 1000, and there is no reason, of course, why the same rule should not apply to a contract of sale. The question is: Do the facts bring the case within the rule? On the one hand, we have the following situation: The Youngs were financially embarrassed and unable to carry the loan on their home. McCraw was their friend and anxious to help them. He had a home of his own and did not want the Young home. At first Mr. Young offered to give him their equity in the place. This was refused and McCraw offered the Youngs $1,000 for an option to buy the place at $20,000. The offer was declined on the ground that $1,000 would be a mere gift. Afterward the contract was drawn. It was the understanding that McCraw was putting up the money to allow the Youngs to keep the home, and the contract was a mere memorandum to protect McCraw for any interest or equity there might be in the place over the mortgage. On the other hand, we have the following: The contract was drawn by an able lawyer who knew the difference between a contract of sale and a mortgage. The contract was one of sale. It warranted the property free of all encumbrances ex-

cept the mortgage for $12,000 in favor of the Fidelity & Columbia Trust Company, and the taxes for the year 1930. McCraw assumed the payment of the mortgage and taxes, and agreed to pay $1,000 in cash, receipt of which was acknowledged, and to execute his negotiable promissory note for $7,000, to be paid on or before September 10, 1931, at 6 per cent. interest. To secure the payment of the note a lien was retained on the property. The Youngs agreed to occupy the property and to pay rent at the rate of $50 a month until possession was demanded by McCraw, and agreed to surrender possession on demand. The Youngs also agreed whenever requested by McCraw to execute a deed conveying to him a fee-simple title to the property. After the execution of the contract the Youngs paid the rent for several months, and McCraw kept up the payments on the mortgage as long as they continued to pay the rent. Thereafter McCraw demanded possession of the property and the execution of the deed pursuant to the contract. It is an unusual thing for one intending merely to create a lien on his property to agree to pay rent and to give possession and execute a deed when demanded. It is even more unusual for a mere lender of money on property to agree to pay the taxes and insurance on the property. But as the form of the transaction is not controlling, we might be able to uphold the chancellor's finding were it not for other circumstances that cannot be overlooked. On being asked if he ever represented the contract to Mrs. Young to be a contract of absolute sale, and that he expected Mr. McCraw to take the property at $20,000, Mr. Young replied:

"A. As I remember there was some doubt in our minds to start with as to whether it was an actual sale or not, to my mind I cannot tell the exact date, but I know that some time later I knew it wasn't an exact sale and Charlie had merely advanced us this money in order that we would not lose our home."

Of course, the question is not what Mr. Young concluded was the contract after it was executed, but what was the intention of the parties at the time of its execution, and his statement falls far short of showing that the contract was intended as a mere security for a debt, and not as a contract of sale. If more be needed, we find it in the repeated statement of Mr. McCraw himself that the contract gave him a right to purchase the property,

and that the Youngs could force him to take it any time they wanted to, according to the contract. Taking the evidence as a whole, and weighing it in the light of the conduct of the parties and their construction of the contract at the time of its execution, it is not possible to uphold the finding of the chancellor. There is nothing in the entire transaction from which it could be inferred that McCraw could sue and recover of Mrs. Young any sums paid on the contract. Though it be true that the purpose of the contract was to protect McCraw, the method of protection was an out-and-out sale, and not a mortgage nor a contract in the nature of a mortgage. It follows that Mrs. Young is entitled to recover any balance due under the contract of sale. In the circumstances McCraw is not entitled to have credited on the purchase price any payments made on the mortgage, or for taxes and insurance, but is entitled to be credited by all sums which he paid to the Youngs, or either of them, after the execution of the contract. As McCraw assumed only the $12,000 mortgage, and the $14,000 mortgage to the Home Owners' Loan Corporation is a lien on the property, he is also entitled to be credited with any excess of the latter mortgage over and above the $12,000 mortgage and interest. On the return of the case the chancellor, without regard to any previous finding, will ascertain these amounts and credit them on the purchase price and give judgment in favor of Mrs. Young for the balance, if any.

Judgment reversed, and cause remanded for proceedings not inconsistent with this opinion.